# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FORT MYERS DIVISION

James R. Sandusky,

     Plaintiff,

v.                            Case No:  2:12-cv-630-FtM-38DNF

COMMISIONER OF SOCIAL
SECURITY,

     Defendant.

_____/

## ORDER[1]

This matter comes before the Court on Plaintiff's Complaint (Doc. #1) filed on November 12, 2012. Plaintiff, James R. Sandusky seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying his claim for Social Security Disability benefits. Plaintiff filed a Memorandum in Opposition to the Commissioner's Decision (Doc. #20) filed on May 10, 2013. The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number) along with a Memorandum in Support of the Commissioner's Decision (Doc. #25) on August 6, 2013.  Plaintiff filed a Reply Brief (Doc. #28) in response to the Commissioner's Memorandum of law in support of the Commissioner's final

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

decision on August 16, 2013.   For the reasons stated herein, the Court affirms the decision of the Commissioner.

## FACTS

### *Procedural History*

On April 7, 2010, Plaintiff applied for a period of Disability and Disability Insurance Benefits ("DIB"), alleging his disabling condition began on March 1, 2008. (Tr. 51, 86). This claim was denied initially on June 23, 2010, and upon reconsideration on August 13, 2010. (Tr. 10).   On August 23, 2010, Plaintiff filed a Request for Hearing by an Administrative Law Judge ("ALJ"). (Tr. 63) A video hearing was scheduled and held on August 24, 2011, where Plaintiff appeared in Fort Myers, Florida before ALJ Frederick McGrath. (Tr. 10, 27, 29). An unfavorable decision was issued by the ALJ on November 9, 2011, and Plaintiff filed a Request for Review of the ALJ"s decision with the Appeals Counsel. (Tr. 1, 7, 21). The Appeals Council denied Plaintiff's Request for Review on September 21, 2012. (Tr. 1). On November 21, 2012, Plaintiff filed a Complaint in the United States District Court for the Middle District of Florida. (Doc.# 1).   The matter is now fully briefed and ripe for this Court's review.

### *Plaintiff's History*

Plaintiff was fifty-three (53) years old on the alleged onset date of disability. (Tr. 86). Plaintiff completed 4 or more years of college. (Tr. 105). Plaintiff had only one job in the last fifteen years as an Electrical Engineer. (Tr. 106). Plaintiff alleges that he stopped working because of his disability. (Tr. 29, 86). Plaintiff claims that he is unable to work because of a stroke, a heart attack, a left shoulder injury, high blood pressure, and bipolar disorder. (Tr. 58). Plaintiff claims that because of his disabilities he can only sit for a

couple of hours and he can only stand for thirty minutes at a time. (Tr. 34). Plaintiff testified

that his typical day includes cleaning around the house, cooking, and taking the dog for

a walk. (Tr. 33).

<u>*Medical History*</u>

<u>*Physical Impairments*</u>

The medical records begin when Plaintiff was admitted to Memorial Regional

Medical Center on July 30, 1999, for a bifrontal contusion with a traumatic brain injury.

(Tr. 630). Plaintiff was hospitalized for cognitive deficits following a traumatic brain injury

from August 2, 1999 to August 5, 1999. (Tr. 626). Plaintiff was again hospitalized from

November 24, 2002 to November 27, 2002, at the Millard Fillmore Hospital for coronary

artery disease. (Tr. 192) During this hospital stay, Plaintiff underwent a cardiac

catheterization, which revealed severe coronary atherosclerosis of the left anterior

descending coronary artery. (Tr. 195). Plaintiff had a stent placed in the left anterior

descending coronary artery. (Tr. 194). An electrocardiogram reported a borderline first

degree AV block with nonspecific T wave abnormalities. (Tr. 198).

On August 30, 2005, Plaintiff went to the emergency room following a motor-

vehicle accident complaining of a headache and was diagnosed with blunt trauma and

closed head injury. (Tr. 282-83). Then on January 17, 2007, Plaintiff underwent left

shoulder arthroscopy with extensive debridement, synovectomy, excision of the

acromiale, and decompression. (Tr. 202). On November 16, 2007, Plaintiff again went to

the emergency room following a motor-vehicle accident and was diagnosed with blunt

trauma and traumatic brain injury. (Tr. 232). On March 7, 2008, Plaintiff underwent an

exercise stress test which found an upsloping ST depressions in the inferolateral leads.

(Tr. 271). In addition, an electrocardiogram from the same day reported borderline first degree AV block. (Tr. 296). Plaintiff had a chest x-ray done on March 21, 2008 which noted mild cardiomegaly and patchy atelectasis or infiltrate in the right lung base. (Tr. 314). Then, on March 26, 2008, Plaintiff underwent left heart catheterization, left ventriculography, and coronary angiography. (Tr. 308).

From October 30, 2008 to November 1, 2008, Plaintiff was hospitalized for right-sided body weakness and an acute cerebrovascular accident. (Tr. 287). A carotid duplex scan reported evidence of 16 to 49% stenosis of the proximal internal carotid artery. (Tr. 383). An electrocardiogram revealed borderline first degree AV block. (Tr. 381). An MRI of the brain reported a periventricular white matter cerebrovascular accident at the level of posterior frontal periventricular white matter. The MRI also showed punctuate adjacent thalamic areas of restriction, and probable changes of trauma in the bifrontal region and subcortical white matter. (Tr. 372).

On July 9, 2010, Plaintiff went to the emergency room for a wrist injury. (Tr. 573). Plaintiff had a left wrist obvious deformity and right thigh hematoma. (Tr. 574). An x-ray of the left wrist revealed a comminuted fractured distal left radius with marked volar angulation and displacement. (Tr. 577). A CT of the head noted bilateral frontal hypodensities and persistent opacification of the right maxillary sinus. (Tr. 579). Plaintiff was diagnosed with a fractured distal radius with volar displacement, ulnar displacement, right thigh contusion or hematoma, and left facial contusion. (Tr. 575). On July 13, 2010, Plaintiff went to the emergency room for a fractured left wrist. (Tr. 588). He underwent open reduction and internal fixation of the left distal radius fracture. (Tr. 589). An x-ray of the left wrist noted post-operative changes involving the distal radius. (Tr. 595). On

December 28, 2010, Plaintiff went to the emergency room for coronary artery disease and recurrent angina. (Tr. 582). A myocardial exam noted a left ventricular ejection fraction of 54%. (Tr. 586).

On August 30, 2010, an x-ray of the left wrist noted a healed fracture with depression on the ulnar articular surface. (Tr. 539). On September 15, 2010, Plaintiff was diagnosed with right knee internal derangement and underwent a right knee arthrogram and injection under fluoroscopy. (Tr. 541-42). An MRI of the right knee was completed on October 5, 2010, which revealed a healing fracture of the lateral tibial plateau with associated bone marrow edema, superimposed osteoarthritis, subchondral cyst, and findings suspicious for a probable superior surfacing tear of the posterior horn of the medial meniscus. (Tr. 546). On October 7, 2010, Plaintiff was diagnosed with a right knee lateral tibial plateau fracture and right knee medial meniscus tear. (Tr. 548). Plaintiff was given the same diagnoses again on October 28, 2010. (Tr. 549-50). On November 18, 2010 Plaintiff was diagnosed with an acute medial meniscus tear of the right knee and a healed tibial plateau fracture. (Tr. 551). On December 1, 2010, Plaintiff had a moderate-sized effusion of the right knee and was diagnosed with medial meniscus tear and post-traumatic changes of the lateral tibial plateau of the right knee. (Tr. 553).

On February 27, 2008, Plaintiff attended treatment with Dr. Joseph Salaz and was diagnosed with hypertension, arthritis, and lipidemia. (Tr. 462-63). On April 2, 2010, Plaintiff was diagnosed with hypertension, arthritis, coronary artery disease, lipidemia, and anxiety disorder. (Tr. 456-57). On March 12, 2008, Plaintiff was treated by the Associates in Cardiac Care and diagnosed with chest pain and coronary artery disease. (Tr. 291). On April 11, 2008, Plaintiff was diagnosed with coronary artery disease, in-stent

restenosis, obesity, hypertension, and dyslipidemia. (Tr. 351). On September 17, 2008, the facility drafted a letter stating that Plaintiff suffered from a coronary condition which limited his physical ability to work. (Tr. 363).

Plaintiff attended the Associates in Neurological Care on November 18, 2008. Plaintiff was noted to ambulate with a limp and had limited range of motion at his cervical spine. (Tr. 396). Plaintiff was diagnosed with cerebrovascular accident, small vessel disease, and possible left subcortical region, history of dyslipidemia, hypertension, and history of bipolar disorder. (Tr. 396).

An electrocardiogram from December 22, 2010, noted a first degree AV block. (Tr. 293). On December 22, 2010, Plaintiff was diagnosed with hypertension, hyperlipidemia, coronary artery disease status post stent-placement, and recurrent chest pain. (Tr. 611). On July 1, 2011, Plaintiff was diagnosed with hypertension, hyperlipidemia, coronary artery disease status post stent-placement, and diabetes mellitus. (Tr. 608).

*Psychological Impairments*

On June 5, 2008, Plaintiff began treatment with Dr. Ivan Mazzorana. He was diagnosed with bipolar disorder; he was prescribed Lithobid2 and Clonazepam3. (Tr. 360). On July 1, 2008 and July 30, 2008, Plaintiff was diagnosed with hypomanic bipolar disorder. (Tr. 356-58). Plaintiff began treatment with Dr. Luis Rives on August 20, 2008, when he complained of sleep disturbances. (Tr. 404). He was diagnosed with bipolar disorder from August 20, 2008 until May 13, 2009. (Tr. 398-405). On January 7, 2009, Plaintiff had irritability, mood swing, right leg weakness, and imbalance. (Tr. 401). Plaintiff has a history of alcohol abuse. (Tr. 405, 454).

6

On February 9, 2010, Plaintiff was seen by Dr. Nelson Hernandez for psychological treatment. Plaintiff was diagnosed with bipolar disorder with psychosis and posttraumatic stress disorder. (Tr. 568). On March 26, 2010, Plaintiff was given the same diagnoses. (Tr. 562). From May 7, 2010 to May 27, 2011, Plaintiff was given the same diagnoses of bipolar disorder with psychosis, posttraumatic stress disorder, and organic brain syndrome. (Tr. 556-60; 597-99). On July 2, 2010, Plaintiff had decreased sleep, depression, and flashbacks. (Tr. 559). On July 30, 2010, he complained of mood swings, racing thoughts, anxiety, and psychomotor retardation. (Tr. 558). Plaintiff had sleep disturbances, depression, decreased motivation, and anger on October 1, 2010. (Tr. 557).On December 3, 2010, Plaintiff had mood swings and depression. (Tr. 556). On February18, 2011, and again on March 25, 2011, Plaintiff had psychomotor retardation and depression. (Tr. 598-99).

Beginning on July 23, 2009, Plaintiff was treated by Dr. Steve Machlin. He reported depression, irritability, pressured speech, and impulsivity. (Tr. 414). Plaintiff was diagnosed with bipolar affective disorder. (Tr. 415). On November 17, 2009, Plaintiff had anxiety and irritability. (Tr. 412). On January 6, 2010, Plaintiff complained of anxiety, irritability, depression, poor energy, and impaired concentration. He was again diagnosed with bipolar disorder. (Tr. 411). Plaintiff had irritability, anxiety, and impaired concentration on January 7, 2010. (Tr. 410). Plaintiff was diagnosed again with bipolar disorder on January 19, 2010, and on February 2, 2010. He had passive suicidal ideations and sleep disturbances. (Tr. 408-09).

From January 15, 2010 to January 16, 2010, Plaintiff was hospitalized at the Riverside Behavioral Center. (Tr. 418). He had mania, restlessness, talkativeness, mood

7

swings, racing thoughts, flight of ideas, and poor sleep. Plaintiff also had poor insight, poor judgment, anxiety, hyperactivity, pressured speech, agitation, decreased concentration, and problems with interpersonal relationships. (Tr. 418, 422-23). He was diagnosed with bipolar disorder. (Tr. 418). From February 9, 2010 to February 14, 2010, Plaintiff was hospitalized again. (Tr. 432). He had flight of ideas, mood swings, racing thoughts, hopelessness, depression, and pressured speech. (Tr. 429-30). He also had impairments in cognitive functioning, judgment, and insight. (Tr. 439). A CT of the brain reported findings compatible with posttraumatic encephalomalacia or old infarctions in both frontal lobes, focus of scarring or old lacunar infarction, and scarring or mucous membrane opacification of the right maxillary sinus. (Tr. 446).

Dr. Hernandez completed a Medical Source Statement on May 14, 2010. (Tr. 469). Plaintiff was reported to have tangential thoughts and poor recent memory. He also had racing thoughts and mood swings. He was diagnosed with bipolar disorder with psychosis, posttraumatic stress disorder, and organic brain syndrome. (Tr. 468-69). On May 27, 2011, Dr. Hernandez completed a Mental Capacity Assessment pertaining to Plaintiff. (Tr. 570). Dr. Hernandez found that Plaintiff had extreme limitations in carrying out very short and simple instructions; maintaining attention and concentration; sustaining an ordinary routine, completing a normal workday or workweek; interacting appropriately with the general public; getting along with coworkers or peers; maintaining socially appropriate behavior; responding appropriately to changes in the work setting; and setting realistic goals. Plaintiff had marked limitations in performing activities within a schedule; working in coordination with others; making simple work-related decisions; accepting instructions and responding appropriately to criticism; being aware of normal hazards;

and being able to travel in unfamiliar places. Additionally, Dr. Hernandez found that Plaintiff had moderate limitations with asking simple questions or requesting assistance. Dr. Hernandez stated that his findings were supported by Plaintiff's mood swings, racing thoughts, confusion, flashbacks, nightmares, depression, decreased sleep, poor focus, and poor memory, poor planning, and distractibility. (Tr. 570-71).

<u>*State Agency Evaluations*</u>

On June 22, 2010, Plaintiff had a consultative evaluation with Dr. Eshan Kibria at the request of the SSA. (Tr. 488). He complained of lower back pain. (Tr. 488). He had decreased range of motion of the shoulders and lumbar spine. (Tr. 489-90). Plaintiff was diagnosed with history of bipolar, left shoulder injury, cerebrovascular accident, history of myocardial infarction with stent-placement, and obesity. (Tr. 489).

On June 23, 2010, Mr. Christopher Henning completed a Residual Functional Capacity ("RFC") questionnaire as a single decision-maker, and not a medical physician. Mr. Henning was a file-reviewing, non-examining consultant. (Tr. 50). Mr. Henning reported that Plaintiff was diagnosed with status post stroke in November of 2008 and status post a left shoulder surgery of 2008. (Tr. 43). He also checked boxes stating that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, and sit, stand, or walk for six hours in an eight-hour workday. (Tr. 44).

On August 9, 2010, Dr. Richard Wall completed an RFC, which diagnosed Plaintiff with stroke, hypertension, coronary artery disease, left shoulder pain, and obesity. (Tr. 508-15). Dr. Wall checked boxes stating that Plaintiff was capable of lifting 50 pounds occasionally and 25 pounds frequently. Additionally, Dr. Wall stated that Plaintiff could sit, stand, or walk for six hours in an eight-hour workday. (Tr. 509).

On June 11, 2010, Dr. Eric Wiener completed a Psychiatric Review Technique ("PRT") as a file-reviewing, non-examining medical consultant. (Tr. 470). Dr. Wiener reported that Plaintiff had moderate limitations with activities of daily living, social functioning, and maintaining concentration, persistence, and pace. (Tr. 480). Dr. Wiener also completed a Mental Capacity Assessment ("MCA") pertaining to Plaintiff. Dr. Wiener found that Plaintiff had moderate limitations in maintaining attention and concentration, understanding and remembering detailed instructions, carrying out detailed instructions, completing a normal workday or workweek, interacting appropriately with the general public, and responding appropriately to changes in the work setting. (Tr. 484-85).

On August 13, 2010, Dr. Gary Buffone also completed a PRT as a file-reviewing, non-examining medical consultant. (Tr. 516). Dr. Buffone checked boxes stating that Plaintiff had mild restrictions with activities of daily living and mild difficulties in maintaining concentration, persistence, or pace. (Tr. 526).

## *Administrative Law Judge's Decision*

At step one, the ALJ found that Plaintiff had met the insured status requirement of the SSA through December 31, 2013, and had not engaged in substantial gainful activity after March 1, 2008, the alleged onset date. (Tr. 12).

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: cerebrovascular accident (CVA); coronary artery disease; hypertension; obesity; and a history of a left shoulder injury. (Tr. 12). The ALJ made these finding after reviewing the medical evidence of record. Plaintiff's record indicates a history of substance abuse. (Tr. 13). The ALJ noted that Plaintiff's medically determinable mental impairments of bipolar affective disorder and alcohol abuse do not cause more than

minimal limitations on Plaintiff's ability to perform basic mental work activities and are therefore nonsevere. (Tr. 13).

Additionally, at step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15). At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform the full range of medium work as defined in 20 C.F.R. 404.1567(c). (Tr. 15). Using the two-step approach the ALJ first found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they are inconsistent" with Plaintiff's RFC assessment. (Tr. 16).

The ALJ also found at step five that Plaintiff was capable of performing past relevant work as an electrical engineer. (Tr. 19). The ALJ further found that Plaintiff is capable of performing other jobs in the nation economy. (Tr. 20). The ALJ considered Plaintiff's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404 Subpart P, Appendix 2  to determine that Plaintiff could make a successful adjustment to other work. (Tr. 20). Accordingly, the ALJ found that Plaintiff was not disabled during the above stated time period. (Tr. 21).

## **STANDARD OF REVIEW**

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, and whether the findings are supported by substantial evidence.  Hibbard v. Comm., 2007 WL 4365647 at *2 (M.D. Fla. Dec. 12, 2007) (citing

Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971);
McRoberts v. Bowen, 841 F. 2d 1077, 1080 (11th Cir. 1988)).  In evaluating whether a
plaintiff is disabled, the ALJ must follow the sequential inquiry described in the
regulations.[2] 20 C.F.R. §§ 404.1520(a), 404.920(a).  The ALJ's findings of fact are
conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial
evidence is more than a scintilla—*i.e.*, the evidence must do more than merely create a
suspicion of the existence of a fact, and must include such relevant evidence as a
reasonable person would accept as adequate to support the conclusion."  Hibbard, 2007
WL 4365647 at *2 (citing Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing
Walden v. Schweiker, 672 F.2d 835, 838-39 (11th Cir. 1982)); Richardson, 402 U.S. at
401.

Where the ALJ's decision is supported by substantial evidence, the district court
will affirm, even if the reviewer would have reached a contrary result as finder of fact, and
even if the reviewer finds that the evidence preponderates against the ALJ's decision.
Phillips v. Barnhart, 357 F. 3d 1232, 1240 n.8 (11th Cir. 2004).  The district court must
view the evidence as a whole, taking into account evidence favorable as well as
unfavorable to the decision.  Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835,

---

[2] The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability.  The steps are as follows:

*Step 1.*  Is the claimant engaged in substantial gainful activity?  If the claimant is engaged in such activity, then he or she is not disabled.  If not, then the ALJ must move on to the next question.

*Step 2.*  Does the claimant suffer from a severe impairment?  If not, then the claimant is not disabled.  If there is a severe impairment, the ALJ moves on to step three.

*Step 3.*  Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If so, then the claimant is disabled.  If not, the next question must be resolved.

*Step 4.*  Can the claimant perform his or her former work?  If the claimant can perform his or her past relevant work, he or she is not disabled.  If not, the ALJ must answer the last question.

*Step 5.*  Can he or she engage in other work of the sort found in the national economy?  If so, then the claimant is not disabled.  If the claimant cannot engage in other work, then he or she is disabled.  See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f).

837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings).

The court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [ALJ]." Phillips, 357 F. 3d at 1240 n.8; Dyer v. Barnhart, 395 F. 3d 1206, 1210 (11th Cir. 2005). If the ALJ's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1439 (11th Cir. 1997).

## DISCUSSION

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making Plaintiff unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§ 404.1505-404.1511.

In this case, Plaintiff asserts that the ALJ committed the following errors for which remand is required: (1) the ALJ's assessment of Plaintiff's mental impairments as non-severe is not supported by substantial evidence and (2) the ALJ's residual functional capacity finding is not supported by substantial evidence. The Court will consider each issue in turn.

1.  *Whether the ALJ's Assessment of Plaintiff's Mental Impairments as Nonsevere is Supported by Substantial Evidence*

Plaintiff argues that the ALJ's finding that Plaintiff's psychological limitations were nonsevere is not supported by substantial evidence. (Doc. #20). Plaintiff asserts the ALJ

erred by not considering Plaintiff's bipolar disorder, organic brain disorder, and history of traumatic brain injury. (Doc. #20).

In his decision, the ALJ used the five step process to determine Plaintiff's qualification for disability benefits. (Tr. 10). At step two, the ALJ determined Plaintiff had a combination of severe physical impairments, but listed no psychological impairments. (Tr. 12-13). A severe impairment is one that significantly limits a claimants physical or mental abilities to perform basic work activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 404.920(a)(4)(ii), (c), 416.921(a); Bridges v. Bowen, 815 F. 2d 622, 625 (11th Cir. 1987). Plaintiff had the burden to prove that his psychological impairment was severe enough to cause significant limitations. *See* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

To determine the severity of a claimant's mental impairments at step two of the sequential evaluation, the ALJ rates the degree of functional limitation in four broad functional areas: activities of daily living; social function; concentration, persistence, and pace; and episodes of decompensation. See 20 C.F.R. § 404.1520a(c)(3), (d). If a claimant's mental impairments result in "mild" or no limitation in the four functional areas, the impairment will not be considered severe. 20 C.F. R. § 404.1520a(d).

The first function area evaluated was activities of daily living. (Tr. 14). Here, the ALJ found Plaintiff had a mild limitation. (Tr. 14). Plaintiff testified during the ALJ's hearing that he is able to clean around the house, cook, and take the dog for a walk. (Tr. 33). Plaintiff also reported that he had no problems with personal care, preparing meals, or daily living for himself and his wife, including washing the floors and vacuuming, and gardening. (Tr. 14, 133, 135, 141-43).

In the area of social functioning, Plaintiff reported he was able to look for employment, talk with friends, go out daily, use public transportation, shop, and attend church meetings and gatherings twice a week (Tr. 14, 128, 129, 136, 141, 143, 145). With regard to his ability to maintain concentration, persistence, and pace, Plaintiff reported he can pay attention for two to four hours at a time, can follow written and oral instructions, build models, pay his bills, handle a savings account, and he does not need to be reminded to take his medicine, go places, or take care of his personal needs and grooming (Tr. 14, 143-46). Finally, the ALJ concluded that Plaintiff experienced no episodes of decompensation. In light of the foregoing, the ALJ concluded Plaintiff had not shown that he has more than mild or no limitations in the four areas of functioning.

Furthermore, Plaintiff claims that the ALJ's findings are based solely on the report by Dr. Kibria from June 22, 2010. However, Plaintiff misstates the record. The record shows that the ALJ gave Dr. Buffone's, the state agency mental health consultant who reviewed Plaintiff's medical records opinion, great weight. (Tr. 18). Dr. Buffone opined that Plaintiff's mental impairment caused no limitations in the area of maintaining social functioning, no more than "mild" limitations in the areas of activities of daily living and maintaining concentration, persistence, or pace, and that he had no episodes of decompensation, (Tr. 526). Dr. Buffone further opined that any mental impairment was not severe (Tr. 516). The opinion of a non-examining source may be entitled to great weight if it is supported by the evidence in the record. See 20 C.F.R. § 404.1527(e). The ALJ found that Dr. Buffone's opinion was entitled to great weight because it was consistent with the record as a whole. (Tr. 18).

In contrast, the ALJ gave little weight to the assessment by Nelson A. Hernandez because it is not consistent with the record as a whole and is contrary to Plaintiff's activities reported on May 7, 2010, and the treatment notes of Dr. Salaz and Dr. Kibria. (Tr. 18-19). An ALJ is "free to reject the opinion of any physician when the evidence supports a contrary conclusion." Davis, 186 Fed. Appx. at 967 (citing Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985)).  The Eleventh Circuit has also clarified that "an ALJ need not give a treating physician's opinion considerable weight if the applicant's own testimony regarding her daily activities contradicts that opinion." Magill, 147 Fed. Appx. at 94.

Although the record does support a diagnosis of bipolar disorder and organic brain disorder, "a mere diagnosis is insufficient to establish that an impairment is severe." Delker v. Comm'r of Soc. Sec., 658 F. Supp. 2d 1340, 1364 (M.D. Fla. 2009) (citing McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir.1986)). Plaintiff had the burden to prove that this impairment affected his ability to complete basic work activity. *See* Bowen, 815 F. 2d at 625. Contrary to Plaintiff's position, the record as a whole does not support a finding that Plaintiff's mental impairments limited his ability to perform basic work activity. (Tr. 13-14, 31-35).

It is clear that the ALJ properly evaluated the severity of Plaintiff's mental impairments and his decision was based on substantial evidence in the record. Therefore, the undersigned finds that substantial evidence supports the ALJ's findings that Plaintiff's bipolar disorder, organic brain disorder, and history of traumatic brain injury are not severe.

2.   *Whether the ALJ's RFC Assessment is Supported by Substantial Evidence*

Plaintiff also argues that the ALJ's RFC determination is not supported by substantial evidence. (Doc. #20). Plaintiff asserts that the ALJ failed to properly discuss Plaintiff's mental impairments in determining the RFC. (Doc. #20). Plaintiff further argues that the ALJ failed to provide sufficient analysis of how he reached the RFC determination. (Doc. #20). The Commissioner responds that the ALJ properly found Plaintiff could perform the full range of medium work, and substantial evidence supports this finding. (Doc. #25).

The ALJ must determine plaintiff's residual functional capacity (RFC) and, based on that determination, decide whether plaintiff is able to return to his/her previous work. McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). The determination of RFC is within the authority of the ALJ and along with the claimant's age, education, and work experience, the RFC is considered in determining whether the claimant can work. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1520(f)). The RFC assessment is based upon all the relevant evidence of a claimant's remaining ability to do work despite her impairments. Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); Lewis, 125 F.3d at 1440 (11th Cir. 1997) (citing 20 C.F.R. ' 404.1545(a)). The ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case. Phillips, 357 F.3d at 1238. That is, the ALJ must determine if the claimant is limited to a particular work level. Id. (citing 20 C.F.R. § 404.1567).

 "The RFC assessment must first identify the individual's functional limitations or restrictions and assess ... her work-related abilities on a function by function basis.... Only after that may RFC be expressed in terms of exertional levels of work, sedentary, light,

medium, heavy, and very heavy." Social Security Ruling ("SSR") 96–8p, 1996 WL 374184. The ALJ has a duty to make clear the weight accorded to each item of evidence and the reasons for the decision so that a reviewing court will be able to determine whether the ultimate decision is based on substantial evidence. Freeman v. Barnhart, 220 F. App'x 957, 959-60 (11th Cir. 2007) (citing Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir.1981)).

Here, the ALJ considered all the evidence and found it did not support Plaintiff's claimed level of disability. Plaintiff incorrectly claims there is no medical opinion stating Plaintiff is capable of the full range of medium work. (Doc. #20 at 17). In assessing Plaintiff's RFC, the ALJ accorded great weight to the evidence from Dr. Wall, the state agency medical consultant (Tr. 17). Dr. Wall opined that Plaintiff could perform the full range of medium work including occasionally lifting 50 pounds, frequently lifting and/or carrying 25 pounds and standing, walking, and siting for a total of 6 hours in an 8-hour workday. (Tr. 509). Dr. Wall also found that Plaintiff had unlimited ability to push and pull. (Tr. 509). The ALJ found Dr. Wall's assessment was consistent with other medical opinions including Dr. Kibria and Plaintiff's own reported activities. (Tr. 17). Therefore, the ALJ found that the assessment from Dr. Wall is consistent with the objective medical findings in the record, and accepted the assessment from Dr. Wall as reasonable and assigned it great weight. (Tr. 17).

Plaintiff incorrectly asserts that the ALJ failed to evaluate Plaintiff's mental impairments when determining his RFC. (Doc. #20). The ALJ addressed medical opinions concerning Plaintiff's mental limitations. (Tr. 18). As discussed above, when evaluating Plaintiff's mental impairments, the ALJ gave Dr. Buffone's opinion great weight because

it was consistent with the record as a whole. (Tr. 18). Dr. Buffone opined that Plaintiff's mental impairments were not severe. (Tr. 18). The ALJ accorded little weight to the opinions of Dr. Hernandez and State agency psychological consultant Dr. Wiener because those opinions were not consistent with the record and were contrary to Plaintiff's reported activities. (Tr. 19).

Additionally, the ALJ addressed Plaintiff's subjective complaints by finding Plaintiff's statements relating to the seriousness of his limitations inconsistent with the record. The ALJ found that Plaintiff's medically determinable impairments could cause the alleged symptoms. However, in evaluating the credibility of Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms the ALJ found Plaintiff's statements were not credible because they were inconsistent with the record as a whole. (Tr. 16). The ALJ maintained similar findings in regards to the third-party function report of Virginia Sandusky, Plaintiff's wife. (Tr. 19).

The ALJ reviewed Plaintiff's Function Report dated May 7, 2010, and found the report contradicts Plaintiff's statements regarding intensity, persistence and limiting effects of his alleged symptoms. (Tr. 141-148). In the Report, Plaintiff reported he was able to walk his dog, look for employment, talk with friends, prepare meals for himself and his wife, perform light cleaning, use public transportation, go out alone, shop in stores for two hours at a time, build models, and attend congregation meetings twice a week. (Tr. 141-148). While the performance of everyday tasks cannot be used to make a determination that Plaintiff was not disabled, daily activities can be used as a measure of Plaintiff's credibility in regard to his ability to perform certain tasks. *See* Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) (noting that the ALJ properly discredited

a treating physicians testimony by pointing out the contrasts in the claimants daily activities and the physicians diagnosis); Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002) (upholding the ALJ's finding that the claimant's allegations of disabling pain were not credible because of her daily activities demonstrated otherwise).  *See* Norris v. Heckler, 760 1154, 1158 (11th Cir. 1985) (holding that an ALJ may consider plaintiff's demeanor when making a credibility determination).  Thus, the ALJ found that Plaintiff's allegations were not fully credible and failed to support a finding that he was disabled. (Tr. 18).

The ALJ also noted that Plaintiff collected unemployment benefits in 2009 and 2010, and by receiving such benefits, he held himself out as ready, willing, and able to work. (Tr. 17, 91). The ALJ found that receiving unemployment benefits during that time is inconsistent with Plaintiff's allegations of total disability. (Tr. 17). *See* Workman v. Comm'r of Soc. Sec., 105 F. App'x 794, 801 (6th Cir. 2004) (citing Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983)) ("Applications for unemployment and disability benefits are inherently inconsistent."); George v. Astrue, No. CV–11–S–3518–M, 2012 WL 3030157, at *2-5 (NDAL July 20, 2012) (slip op.).  The ALJ properly concluded that Plaintiff's receipt of unemployment benefits did not support a finding of disability. (Tr. 18).

Plaintiff argues the ALJ failed to provide a sufficient analysis of how he reached the RFC determination and such finding is not supported by substantial evidence. (Doc. #20 at 16). However it is clear from the record, the ALJ considered all of the evidence and properly found that it did not support a finding of disability. (Tr. 15).  SSR 96–8p did not require the ALJ to do more. Castel v. Astrue, 2009 WL 42500063 *2 (11th Cir. 2009) (interpreting SSR 96–8p to require the ALJ to consider all relevant evidence when

determining RFC, namely: medical history, medical evaluation, daily activities, and lay evidence). In short, the ALJ properly evaluated Plaintiff's RFC in accordance with SSR 96–8p. Yousif v. Astrue, 8:12-CV-00124-T-23, 2013 WL 764859 (M.D. Fla. Jan. 28, 2013) report and recommendation adopted, 8:12-CV-124-T-23MAP, 2013 WL 764705 (M.D. Fla. Feb. 28, 2013).  Accordingly, the ALJ did not err and his RFC assessment was supported by substantial evidence.

## CONCLUSION

The overall record, discussed above, provides substantial support for the ALJ's decision.  Thus, the undersigned affirms the decision of the Commissioner.

Accordingly, it is now

**ORDERED:**

(1) The decision of the Commissioner is **AFFIRMED.**

(2) The Clerk of the Court shall enter judgment accordingly and close the file.

**Done and Ordered** at Fort Myers, Florida, this 10th day of March 2014.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record